Casey, C. J.,
delivered the opinion of the court:
On the 15th of February, 1853, the claimants entere,d into a contract with the Postmaster General of the United States to carry the mails from Vera Cruz, in Mexico, via Acapulco, to San Francisco, in thirteen days each way, at the sum of four hundred and twenty-four thousand dollars per annum. The contract contained the following clause:
•“ And it is hereby expressly understood that this contract is to have *133 no foree or validity until it shall have the sanction of the Congress of the United States by the passage of an appropriation to carry it into effect.”
In the clause of the contract fixing- the compensation to he paid for the service, it says : for and during the term commencing from the time Congress shall ratify this contract, and ending four years from that date.”
This agreement was entered into with these claimants by Postmaster General Hubbard, in the last days of President Fillmore's administration, and just before the incoming of President Pierce. He was succeeded in the Post Office Department by Judge Campbell. This latter officer was of a different opinion from his predecessor, in regard to this service, and especially of this contract; and early in July, 1853, notified the claimants of his opposition to an appropriation being made for carrying it into effect.
At the meeting of Congress, in December, 1853, the Postmaster General advised against the ratification of this contract, and against the making of any appropriation to carry it into effect. In consequence of this recommendation of the Postmaster General, Congress took no action whatever in the matter. The claimants allege that it was the duty of the Postmaster General to have made a favorable report, and a recommendation that an appropriation should be made. They then aver “ that the Postmaster General did not truly and faithfully represent unto Congress the action of the department and of your petitioners, but that he did falsely and erroneously represent unto Congress that your petitioners had abandoned their contract and were not prepared to carry the same into effect, and recommended that no appropriation be made therefor ; that in consequence of which false representation and recommendation, the said contract, so made as aforesaid, was, by the Postmaster General, abrogated, set aside, and held for naught, by reason of which your petitioners were damaged to a large amount, to-wit: the sum of two hundred thousand dollars, and the United States becomes indebted to them in the said sum of two hundred thousand dollars, ($300,000.)”
They also aver:
“ Your petitioners further state that upon the signing, sealing, and delivery of said contract, they immediately proceeded to carry the same into effect; that they purchased a large number of horses and mules, coaches and mail wagons, employed the necessary carriers, drivers, &c., and incurred divers and sundry expenses, amounting to the sum of one hundred and twenty-two thousand three hundred and *134 twenty-two dollars, ($122,322,) all of which was made and done for the purpose of carrying into effect the said contract so made as aforesaid.”
On the 18th day of August, A. D. 1856, Congress passed an act containing the following provision for the adjustment of the claim of Carmick and Ramsey, to wit:
“ Sec. 6. And be it further enacted, That the First Comptroller of the Treasury he, and he is hereby, required to adjust the damages due to Edward H. Carmick and Albert C. Ramsey, on account of the abrogation by the Postmaster General of their contract on the Vera Cruz, Acapulco and San Francisco route, dated the fifteenth of February, eighteen hundred and fifty-three; to adjudge and award to them, according to the principles of law, equity, and justice, the amount so found due; and the Secretary of the Treasury is hereby required to pay the same to the said Carmick and Ramsey out of any money in the treasury not otherwise appropriated.” — (11 Stat. at Large, p. 95.)
“ The case was first before Hon. Elisha Whittlesey, who was at that time First Comptroller. He resigned without having acted finally on the matter. His successor, Comptroller Medill, decided that nothing was due under the contract. Mr. Whittlesey again came into the office of Comptroller, and the matter being moved before him, was under his consideration when he died, without having rendered any final decision in the case. His successor, Mr. Taylor, took up the case, and on the 9th of November, 1864, rendered the following decision : “ I adjudge aud award to Edward H. Carmick and Albert C. Ramsey, under the authority of the 6th section of the act of August 18, 1856, the above-named sum of forty-three thousand eight hundred and thirty dollars and four cents, ($43,830 04.) ”
This amount was afterwards paid to and received by the claimants, and this suit is to recover the balance of the two hundred thousand dollars, the damages they allege they have sustained by the breach of the contract.
To the petition, the solicitor for the United States has filed a general demurrer, alleging that the matters set forth therein are not sufficient in law to entitle them to recover.
On the hearing of the demurrer, the solicitor contended—
1st. That Congress having failed to ratify the contract, it never had any “ force and validity,” and there could be no damages for the breach of a contract which was never obligatory on either party.
2d. That the claimants are barred by the act of the 18th August, 1856, *135 referring the matter to the First Comptroller, his award made under that act, and the acceptance of the amount so awarded.
I. There are some propositions so plain that they defy both argument and illustration. And the first point in this case is a pregnant example. These parties, the Postmaster General and Carmick and Ramsey, drew up the form of an agreement in writing, both agreeing that it should have “ no force and validity,” should impose no obligation on either, until ratified by Congress. If Congress should approve, it is expressly stipulated it should commence from that time. Until such ratification took place, it imposed no obligation and conferred no rights on either side. It simply remained in abeyance. The Postmaster General, who entered into this conditional agreement, did not even stipulate, on behalf of either himself or his successor, to urge the appropriation upon Congress. It may well be doubted how far such an agreement would have been available against the United States ; but it is unnecessary to consider that question, as nothing of the kind appears in the agreement. In the absence of all stipulations on the subject, we cannot doubt but that it was right and proper for Postmaster General Campbell, if he believed tbe contract an unfavorable one for the government, to so inform Congress, and advise against its ratification and adoption. And his action in doing so could not amount to an abrogation of the contract, for none existed. It was like any other contract, made to take effect on the happening of an event which never occurs. It was a mere embryo, which never arrived at the period of birth, but miscarried before it attained vitality at all.
If these claimants, upon a thing so nebulous as this alleged contract, proceeded to make the larg-e expenditures alleged, we are sorry for their misfortune, hut cannot commend their sagacity, especially when they were apprised at an early period of the hostility of the Postmaster General to its ratification Resting therefore as the case does upon the breach of this alleged contract, which in our opinion never was in anywise obligatory upon the United States, it is wholly without any foundation whatever.
II. Did the act of Congress of 18th of August, 1856, and the proceedings under it, constitute a submission and award 1 If they did, it is admitted the claimants have no cause of action. The counsel of the claimants, by an argument of much ability and ingenuity, liave invited us to a review of our rulings upon this subject. It is contended that the decision of this court in the Gordon case is in conflict with the later cases of Gilbert and of Kellogg. That in the Gordon case the true ground is assumed, that a reference by Congress of a claim to *136 an officer of the accounting or executive departments is not to be regarded as a submission, but as a mere reference for settlement and statement. That neither party is precluded by such reference and report from contesting the matter before the legal tribunals of the country. That the case of Kendall v. The United States, 12 Peters, 524, as to the conclusiveness of the report in that case was predicated of the executive departments, and not intended to give a conclusive and binding effect in the nature of a judgment, so as to preclude judicial cognizance and inquiry of and into the subject-matter. If these positions are correct and are sustained by the authorities, it behooves us to review and correct the errors of the cases cited. And we address ourselves briefly to that inquiry.
The controversy in the Kendall case arose between the Postmaster General and large mail contractors, who claimed certain extra compensation which had been given them under the administration of the department by Mr. Kendall’s predecessor. These the latter refused to recognize or allow. The contractors appealed to Congress, and they, on the 2d July, 1836, passed an act authorizing and directing the Solicitor of the Treasury “ to settle and adjust the claims ” of the contractors ; “ to inquire into and determine the equity of the claims, or any of them“ and to make such allowances therefor as upon a full examination of all the evidence may seem right, according to the principles of equity.” 6 Stat., 665. The act further enacted, “ and that the Postmaster General be, and he is hereby, directed to credit such mail contractors with whatever sum or sums of money, if any, the Solicitor shall so decide to be due to them for or on account of any such service or contract.” The Solicitor assumed upon himself the duty enjoined by the act, and made an award in favor of the contractors in the sum of one hundred and sixty-one thousand, five hundred and sixty-three dollars and eighty-nine cents, ($161,563 89.) The Postmaster General claimed that the award was for more than was due, and refused to give a credit to the contractors for more than one hundred and twenty-two thousand, one hundred and two dollars and forty-six cents, ($122,102 46.) It was to compel him to allow and credit the residue of the award, viz., the sum of $39,462 43, that the mandamus was prayed for in that ease. The relators based their right to the writ on the ground that there had been a submission of the question involved to arbitration, and an award made, which was obligatory upon all the parties, and an end of the controversy. The same objections to the conclusiveness and finality of the award that have been so earnestly pressed upon us, were urged with great ability upon the attention of *137 tlie Supreme Court by tire eminent counsel who represented' the respondent. But, notwithstanding, the court decided that the report of the Solicitor was a valid and binding award, and left no room for the exercise of any discretion in the Postmaster General. So far as we know, this point of the case has never been doubted, disputed, or departed from in the least by that high tribunal. But, on the contrary, the question having again arisen upon the same award, it was most expressly and distinctly reaffirmed with great clearness and emphasis in the subsequent case of Kendall v. Stokes, 3 How., 87. In this case the same mail contractors sought to recover of Mr. Kendall damages for having refused to give the credits and make the allowances as adjusted by Mr. Barry, his predecessor. But the Supreme Court held that such damages were a part of the subject-matter referred to the Solicitor of the Treasury, or grew directly out of the same, and that any inquiry into them was precluded by the award in that case,' it being final and conclusive of all matters embraced in the submission. Mr. Chief Justice Taney, in delivering the judgment of the court, says,“ The question, then, on the first count is, can a party, after a reference, an award, and the receipt of the money awarded, maintain a suit on the original cause of action upon the ground that he had not proved before the referee all the damages he had sustained; or that the damages exceeded the amount awarded ? We think not. The rule on that subject is well settled. It has been decided in many cases, and is clearly stated in Dunn v. Murray, 9 B. & C., 780.”
The case in 9 Barnewall & Cresswell, cited by the court, arose out of a difference in regard to the wages of a person who had been dismissed by his employer before the end of the time for which he had been hired. That case was referred to an arbitrator, who awarded to the servant the wages to which the whole period of service would have entitled him. The same party,'after having accepted the amount of the award, brought a new suit to recover damages sustained by reason of his dismissal. The former award was held to be a complete bar.
The cases of Gilbert’s Adm’r v. The United States, 1 C. Cl’s R., 108, and Kellogg v. The United States, id. 310, are full recognitions of the binding authority of the cases we have cited. In neither of those cases were the words of the acts making the reference so strong and explicit as in this case; nor were the attendant circumstances showing concurrence in the submission and acquiescence in the award any more emphatic than in the present case.
But the claimants suppose that the case of Gordon, administrator *138 of Fisher, v. The United States, is precisely like this case; and inasmuch as we there held that the reference to the Secretary of War and his report did not constitute an award, that we must, necessarily, to maintain the doctrine, decide this case in the same way. In our opinion the two cases are entirely dissimilar. In that case there were four different acts passed in relation to the adjustment of the same claim. The first was approved on the 12th of April, 1848. — (9 Stat., 712.) And if the question had depended upon the award made under that act, without any further acts or proceedings than the receipt of the money by the claimant, we might have -ruled it differently. But the question of submission to arbitration, or reference to a person, is but one form of a contract, and the proof of its existence and rules for its interpretation are the same as in any other kind of agreement. And in all such the governing and controlling consideration is the intention of the parties, as it may he gathered from their words and actions. And while we have said the words of the first act under which it was referred, and all the attending circumstances of the case, up to the passage of the 2d act on the 22d of December, 1854, (10 Stat., 835,) were such as would have induced us to.suppose that it had been intended to close the case finally, by a binding and conclusive award; yet it was perfectly competent for the parties interested to put their own construction on their own acts. There was nothing to prevent Congress and the claimants from agreeing to hold it as not precluding further inquiry. That they did so agree is evidenced by the fact that by the mutual consent and authority of Congress and the claimant, the case was again and again regarded and held as an open one. Four several acts directing re-statements and- settlements were passed by Congress. Each time the claimants acquiesced in, nay, doubtless requested the passage of these acts; each time appeared and claimed before the officer designated to make the settlement. The language of the last act, under which the award was -made which was claimed as conclusive, was peculiar. It directed the Secretary of War “ to restate and resettle the account,” “ and to make such corrections in his former statement and settlement, and sueh further allowances, if any, on account of said claim, beyond what has heretofore heen allowed and paid, as, in his opinion, justice to the claimant shall require.” Nor does this one, or the two preceding acts, make provision for the payment of the amount found due upon the ‘‘ restatement or resettlement ” directed. The first act contained that provision, all the others omitting it, thus -leaving it to be inferred that Congress did not intend that it should be a final and binding submission ; for *139 by the omission of any provision for payment, it would necessarily have to pass under the revision of Congress, when an appropriation should be asked for that purpose. Upon what ground could we have held that this report was final, when the parties themselves had elected-to consider all the previous ones as only statements or efforts to attain a final and satisfactory settlement ? Both parties heretofore had concurred that they did not intend a final and binding effect to be given to similar acts and declarations in the same case. Upon what fair and reasonable interpretation could we find they intended this to be otherwise? And in further evidence of that intention we had the express declaration of Congress, in the repeal of the resolution under which the settlement was made, declaring that it was not final, and not so regarded by one of the contracting parties. In every aspect we considered that case devoid of merits. It came up on demurrer, and we did not consider it uecessary to go into all the facts and circumstances of the case. We thought then, and still believe, that the case is impregnable on the grounds assumed in the opinion of Judge Peck, when taken in connection with the history of the case and the acts of the parties, and their mutual dealings in regard to the subject-matter. If the decision is read in the light of its own facts and history, and with reference to them, and not as an abstract homily on law in general, ,we are satisfied it will be found free from conflict with the cases of Gilbert & Kellogg, and also of Kendall v. The United States. (12 Peters, 524.) Parties have a perfect right to agree that the reports or awards made on references or submissions of this kind shall not be final, or that they shall only be so when the parties both agree to them after made. Their agreement makes the law of the case.
Now let us examine the case in hand a little closer, to see how it stands on the principles decided in these cases. The claimants, believing they had a valid claim against the United States, applied to Congress for its payment. It being an unliquidated claim, sounding alone in damages, and Congress, having no means of determining the matter, said : “We will refer the whole subject to the First Comptroller of the Treasury. That officer shall ‘adjust the damages due to’ you ; and, after having made that adjustment, he shall ‘adjudge and award to you, on the principles of law, equity, and justice, the amount-so found due.’”
Tliis was a distinct- offer by Congress to the claimants to submit the matters in dispute. It was only an offer. There was nothing compulsory in it. They might accept or refuse. This court was open to them; and had they refused to accept the reference, or present their *140 case to the referee, and in case of an ex parte hearing and award, and the claimants refusing to receive a benefit from it, or to ratify it, we should unhesitatingly hold that there was no submission, no binding award, and nothing to affect or preclude a recovery in this court. But these claimants chose directly the opposite course. They accepted the submission. They tried their cause before the arbitrator. They presented their testimony ; cross-examined the witnesses of the United States; argued and submitted the whole case. They did more : they accepted the award made in their favor, thus ratifying, adopting, and confirming the whole proceedings, and forever closing their lips against the impeachment of it in any way.
It is now contended that this is no award, but a mere statement of the account, by order of Congress, by an officer of the accounting department. But against this theory is the fact that it was a pure question of assessment of unliquidated damages. There was no account to state or settle. It presented a clear case for the action of a judge, an arbitrator, or jurors, to settle and determine the damages. There was nothing whatever in it that pertained to the duties of an auditing or accounting officer. It was out of the usual course of official routine. If it had been the subject of settlement as a public account at all in the regular course, it must have gone first to the Postmaster General, who would have determined and settled the grounds and principles upon which the account should be stated. The Sixth Auditor would have settled and adjusted the account, and the First Comptroller, on appeal, could have revised such settlement only so far as the Sixth Auditor’s adjustment or statement of the account was concerned; but the law gave him no power of appeal or revision over the action of the head of the department in allowing a claim, and deciding how and to what extent it shall be paid. But the act took the matter out of the usual course of proceedings in the accounting department; made him sole judge and final arbiter of the case; and the Secretary of the Treasury is ordered to pay the amount without further adjustment or settlement.
Can it be doubted that the same facts and circumstances occurring between two individuals would be held to constitute an arbitrament and award 1 One man makes a demand upon another for damages, by reason of an alleged breach of contract. That other writes: “ I have referred the matter to Mr. A. B., who is required to adjust the damages due to you, and to adjudge and award to you, according to the principles of law, equity, and justice, the amount so found due; and I have filed herewith a check, blank in amount, on my banker for *141 the sum which Mr. A. B. shall find in your favor, with authority to fill it up.”
Now, the claimant need not accept this proposition. He is at perfect liberty to reject it, or to say and do nothing. He can say, “I have a right to try this question before the judicial tribunals. I do not want Mr. A- B.’s award upon it.” He can refuse to appear and submit his case to A. B.; and should A. B. proceed to hear and determine the case ex parte, and make an award, it is beyond all controversy a nullity, unless the claimant should by subsequent acts adopt and ratify the award ; for subsequent ratification is equivalent to precedent authority.
But suppose, without making any actual written or verbal response to the proposition of his adversary, the claimant comes voluntarily before A. B., the referee named, submits his case, produces his testimony, cross-examines the witnesses of the other side, is heard by counsel, secures a report in his favor, A. B. fills up the check deposited by the debtor party, and the claimant indorses it, and lifts the money. Is this an arbitrament and award ? If not that, it is nothing. But it is surely something; and it would be a misnomer to call it by any other name than a pure, simple, indubitable award at common law. There is no form or formula of submission to arbitration. It is simply a question of intention; and that intention may be evidenced by acts as well as words, by what the parties did as certainly as by what they said or what they wrote. It is not necessary that there should be any agreement that it should be final and conclusive; it is so in its nature. Such is the legal effect of arbitrations at common law, without any stipulation to that purport. Two neighbors dispute about their boundary line. One says : “Let us get a surveyor, and let him settle the liñe.between us.” The other says : “Agreed.” The surveyor comes, and funs and marks the line. It is conclusive. Why ? Because it was submitted to him as an arbiter in the case. His line designated upon,the ground is his award; and although it may not be the true line, yet, if made according to the submission, and without fraud or undue bias, it is conclusive. (Bowen v. Cooper, 7 Watts, 311; Perkins v. Guy, 3 Serg’t and Raw., 327; Robertson v. McNeil, 12 Wend., 578; Mitchel v. Bush, 7 Cow., 185; Babb v. Stromberg, 2 Harris, 399.) In this latter case there was.a parol offer of submission, which was not formally accepted; but the parties went before the arbitrator, and he made an award. Gibson, C. J., says : “Now, it is not pretended there was, in this, an explicit submission expressly offered and accepted; but a parol submission, like any other agreement, depends *142 on the assent of the parties, and it may be signified by acts as well ,as words.” In the case of Burchell v. Marsh, (17 How., 344,) Mr. Justice drier says: “ If the arbitrators have given their honest, in-corrupt judgment on the subject-matter submitted to them, after a full and fair hearing of the parties, they are bound by it, and a court of chancery has no right to annul their award because it thinks it could have made a better.” In the case of Ghrismany. Moran, (9 Barr, 487,) a party, who had a legal ground of objection against the appointment or substitution of an arbitrator, made the objection, and then agreed with the other side to go on and try the case before the arbitrator, reserving his objection; but it was held to be waived by going to trial. Gibson, C. J., says : “ He was bound to give up his chance of an award in his favor, or his objection ; for they could not exist together. Had the arbitrators awarded in his favor, he might, notwithstanding his protest, have enforced the award, and mutuality of submission requires that both should be bound or neither.”
A submission to arbitration is but one form of a contract. Its existence may be proved, and its terms interpreted in the same way as other agreements; the intention of the parties being the polar star by which we are to be guided and governed. It need not be written. At common law a submission and award both may be by parol. (Cope v. Gilbert, 4 Denio, 347.) The award must be according to the submission ; must be mutual, certain, and final. Here the intention on the part of Congress is clear and explicit. The acts of the claimants are as unequivocal as are the declarations of Congress on the same subject. The award is strictly according to the submission. It embraces the whole subject-matter, and nothing else; and it is rendered in the very words of the submission. It is mutual; for it has been held that an award of a sum of money carries in itself a mutuality, as it must be held to be in satisfaction of the matter submitted. ( Weed v. Ellis, 3 Cai. Rep., 253; Munroe v. Alaire, 2 Cai. Rep., 320.) It is certain. There is no ambiguity in its terms. It was for a definite, specific sum of money for the damages sustained. It was final. After the execution or performance of the award, by the payment of the money on one side, and its receipt on the other, it closed the whole controversy. (See 3 Chitt. Com, Law, 637, 668; 3 Bl. Com., 17; Chitty Ed. Caldwell on Arb.; Kyd on Awards; Watson on Arbitration, 145 et seq.)
In any view we take of this case, we think the claimants are without any standing in court. Upon the contract or paper set up there is no sort of claim made out. It never became binding on the paij *143 ties, because it was never approved or affirmed by Congress. And there could be no breach where there was no obligation, no abrogation of that which did not exist, and no damage where there were no rights to invade or property to destroy.
Whatever rights were acquired under the act of 18th August, 1856, were fully satisfied by the award and its acceptance. Those were a full execution of its provisions. Such we conceive to be the law of this case; and it is a source of satisfaction to believe that its application in this instance does no injustice to the claimants.
The demurrer is sustained, and the petition dismissed.
Judge Peck did not sit in this case.