Weldon, J.,
delivered the opinion of the court:
The claimant’s action is based upon an alleged contract, bearing date the 29th of June, 1892, executed on behalf of the defendants by Major Lee, of the Quartermaster’s Department, and claimant, in relation to building a road from Wingate Station to Fort Wingate, N. Mex., a distance of about 3jJ- miles. The contract was subject to the approval of the Quartermaster-General.
*387 Embraced in tbe contract are four classifications of work, to wit: Grading, bridges, culverts, and stonework, to wit, macadam. Tbe work, by tbe terms of tbe agreement, was to be commenced on tbe 29tb day of June and finished by tbe 1st day of November, A, D. 1893. Tbe claimant was to receive tbe sum of $2,700 for tbe grading, $700 for tbe bridges, $25 for each culvert, a certain price per lineal yard for the macadam, depending upon tbe depth, indicated at tbe different stations, as shown in a schedule of prices set forth in tbe agreement. Tbe contract price of tbe grading, bridges, and culverts is definitely fixed by'tbe terms of tbe agreement, except as to tbe aggregate amount of tbe compensation for culverts — the number not being specifically determined. Tbe number of culverts built was 13, which, at $25 per culvert (tbe contract -price), amounts to tbe sum of $325, which, being added to tbe compensation provided for tbe grading and bridges, amounts to tbe sum of $3,725.
Tbe work of grading, bridges, and culverts was finished by tbe claimant on the Gth day of September, 1892, to tbe satisfaction of tbe officer in charge, and the claimant has been paid in full for such labor.
But it is alleged that tbe contract was disapproved by tbe Quartermaster-General, and order was given by him that no work should be done on said road beyond tbe grading, bridges, and culverts, and in consequence of such order claimant was not permitted to complete tbe remainder of tbe work, to wit, the stonework, and as a result of such disapproval of tbe Quartermaster-General and refusal of tbe defendants to permit him to perform tbe labor as to the stonework, be has been damaged, because of being unable to utilize tbe labor of men employed by him and to use tools and material prepared for tbe execution of said work, to tbe extent of $2,500.
It is also alleged that if be bad been permitted to perform tbe contract as to tbe stonework to tbe extent of $6,225 for tbe prices specified in tbe agreement, be would have realized a profit of $3,700.
Tbe contract, by tbe understanding of tbe parties, limited tbe amount to be expended in tbe work to tbe sum of $10,000, and one of tbe terms of tbe agreement provided “for placing stonework per lineal yard as may be directed by tbe officer in immediate charge of tbe work,” thereby limiting tbe macadam to a sum which, being added to the cost of tbe other part of *388 the work, would bring the whole expenditure within the limit of the appropriation.
It is upon that theory that the claimant alleges his cause of action to the profits on $6,225, and damages incident to that amount of work.
By the eighth article of the agreement it is provided, “This agreement shall be subject to the approval of the Quartermaster-General of the United States Army.” The Quartermaster-General refused to approve the agreement, and because of such refusal the controversy has arisen.
At the special instance of Major Lee it was provided that the contract work should be commenced on the 29th of June, 1892, in order to prevent the lapse of an appropriation for the fiscal year ending June 30,1892. The practical work was not commenced until the 12th of July, but was diligently prosecuted until September 7, when the work for which claimant has been paid was finished.
On July 16, 1892, Major Lee wrote to the Quartermaster-General, referring to the agreement and recommending the approval of the same, to which the Quartermaster-General replied as follows :
“War Department,
“ Quartermaster-General’s Oepice,
“ Washington, August 2,1892.
“Respectfully returned to the chief quartermaster, Department of Arizona, Los Angeles, Oal. (through department headquarters).
“The Quartermaster-General declines to approve any contract that does not include the whole work for the money authorized.
“R. N. Batchelder,
“ Quartermaster-General, United States ArmyP
On August 6 Major Lee, having received said information of the disapproval of the agreement, sent the telegram set forth in Finding Y.
On the 7th of August, 1892, the postmaster at Fort Wingate gave the claimant the dispatch dated at Los Angeles, Oal., signed, “ J. G. 0. Lee, Chief Quartermaster,” in substance as follows: “Notify Mr. Darragh that when grading and bridge building are completed no further work will be done.” The claimant protested against the curtailment of the contract work on the 7th of August, 1892, and claimed the right to com- *389 píete the same in accordance to the terms of the agreement, to which Major Lee replied as follows:
■ “Headquarters Department of Arizona,
“Office of the Chief Quartermaster,
“Los Angeles, Gal., A%igust 16,1892. “Robert Darrag-h, Esq.,
“(Through Post Quartermaster),

“ Fort Wingate, LT. Mex.

“Sir: Your letter of 7th instant has been received and will be forwarded as you request.
“The justice of your claim seems manifest, and I have recommended that it be admitted.
“But your contract having been disapproved by the Quartermaster-General, I am powerless in the matter, save to recommend reconsideration, which I have done, presenting the justice of your claim to the best of my ability.
“ Yery respectfully,
“J. G. 0. Lee,

“Major and Quartermaster, U.S.A., Ohief Quartermaster.”

The findings show that in preparing for the performance of the work stated in the agreement the claimant made an expenditure in buying tools and appliances, which were left on hand on the 6th of September, 1892, and which he was compelled to sell at a rate reduced from the original cost, but it does not appear how much the reduction was between the original cost and the price at which he sold. In the prosecution of the work of grading the claimant, in anticipation of the performance of the work to the extent of $10,000, prepared material which he could have used in the stonework had he been permitted to perform such work, and the cost or expense of such material is the sum of $50. The findings show that the profit of the claimant on the rockwork would have been $1,895, and of that he has been deprived by the failure and refusal of the defendants to permit him to perform the work to the extent of $10,000.
If the agreement made between the claimant and the agent of the defendants on the 28th of June (notwithstanding the refusal of the Quartermaster-General to approve it) is obligatory on the United States, the claimant is entitled to recover his profits as shown by the findings. The findings show that it would have cost the claimant the sum of $4,330 to have performed the work, for which he would have received tbe sum of $6,225, leaving a difference of profit to him of $1,895.
*390 Tbe theory upon which the claimant seeks to recover is that as to all the items of the contract there was incumbent on the United States the obligation to permit the'claimant to finish the work, and having’ refused the claimant such right, he is entitled to recover whatever damages he has suffered and whatever profits he could have made.
It is insisted that by the terms of the contract the claimant was bound to commence work at once; bound to complete the whole of it within a time limited; that time Was the essence of the contract; hence the defendants were bound to use all reasonable dispatch in the exercise of the right to approve or reject the contract, and having failed to exercise that right within a reasonable time, became bound to perform the agreement. The theory of law upon which this contention is based is that by the inaction of the Quartermaster-General to disapprove the contract the claimant was invested with the right as against the action of the Quartermaster-General to insist upon performing’ the agreement to the extent of the appropriation.
The contract by its terms does not definitely determine the extent of the rockworlc. It is provided, “ For placing stonework per lineal yard as may be directed by the officer in immediate charge of the work;” but, conceding that the legal effect of the agreement is to provide for sufficient rockwork, which being added to the cost of other parts amounts to a sum equal to the sum of the appropriation, what are the legal rights of the parties in this proceeding?
Aside from the small amount of rock kept by the claimant to be used in the macadam, the findings do not show that the claimant made any preparation for the whole work that he would not have made for the part which he performed.
Although the parties were very desirous that the work should be commenced in theory, in order to save the appropriation, the diligence seems to have stopped at that point, as it is shown that the work was not in fact commenced until the 12th of July.
On July 16, four days after the practical commencement of the work, Major Lee forwarded to the Quartermaster-General a letter referring to the agreement and recommending an approval of the contract. On August 2,1862, the Quartermaster-General, by indorsement on Major Lee’s letter, refused to approve the agreement and forwarded such refusal, and the fact *391 of such disapproval was communicated to tbe claimant on the 7th of August, as shown in finding yn.
It does not appear that the claimant made any effort to have the matter of the approval or disapproval of the agreement by the Quartermaster-G-eneral disposed of, or that it became material to ascertain that fact, but proceeded in the performance of the work so far as it related to the grading and bridge work j that work was practically definite in the amount, but the quantity of the roekwork is indefinite, depending upon the action of the engineer.
The conduct of all the parties to the transaction indicates that no great celerity of movement in point of time was expected. The claimant did not practically commence the work until twelve days after the agreement was made; Major Lee did not write to the Quartermaster-General until the 16th of July, and the Quartermaster-General did not indorse on the letter of Major Lee his disapproval of the agreement until the 2d of August; and on the 7th of August the claimant received notice that beyond the grading and bridging no work would be allowed under the contract.
The contract does not require the approval of the Quartermaster-General in writing, but does require his approval in some shape. This court has held: “But in any case, if the approval is not required to be in writing, it may be shown substantially, and the fact that a commanding officer knew of a contract being awarded to a party and then approved vouchers issued under and referring to it is sufficient evidence of such approval.” (Tenney's Case, 10 0. Cls. Ik, 269.)
The contract was to become operative as such upon the approval of the Quartermaster-General. It is not a condition of defeasance, but a condition precedent to the legal effect of the agreement. The Quartermaster-General not having done any act in confirmation of the agreement, the question presented is this: Did his nonaction, from the time he must have received the letter of Major Lee of the 16th of July until the 2d of August, operate inlaw as an approval so as to give vitality to the agreement as a binding obligation on the defendants'?
The alleged agreement had no vitality as a contract until approved by the Quartermaster-General; and, as is said in effect in the Filor Case, so far as the legal liability of the Government is concerned, it was a nullity. In this case, by express provision of the agreement, it was only tentative and not final.
*392 A letter mailed at Los Angeles, Cal., would reach Washington in about five days, so that the letter must have been delivered at the Department about the 21st of July, and was indorsed as indicated on the 2d of August, 1892. Even though the failure of the Quartermaster-General to act within a reasonable time would have the legal effect to validate the contract against the United States, we are not prepared to say that there was unreasonable delay in the act of the Quartermaster-General in disapproving the contract on the 2d of August; the condition of business in his office, the inquiry, and the investigation necessary to be made in order to determine his action in the premises may have justified the delay. A public officer is presumed, in the absence of proof, to have discharged his duty, and no want of diligence can be attributed to the Quartermaster-General in this proceeding founded on the facts as they appear in the findings. It was the duty of the Qua.rter-master-General to determine the question as to whether the agreement was in the interest of the United States, and if so to approve it, and if not, to do as he has done, and the failure upon his part to act can not have the legal effect to confer upon the claimant the right to enforce the contract against the defendants by the recovery of damages for the nonfulfillment.
In making the agreement Major Lee exercised a power subordinate to the Quartermaster-General, and in exercise of that power he did not assume to have the right to make an agreement absolutely binding on the defendants; his action was only preliminary to the exercise of power inherent in his superior'to approve or disapprove his action.
It is contended by claimant that the United States could not exact performance of the contract by the claimant as to part and rescind the contract as to the residue of the work.
There was no rescission of a contract in this transaction. A conditional contract was made which was not fully consummated, and before the final refusal of consummation occurred one of the parties proceeded in the execution of the contract and for such execution has been fully compensated, and no claim is now made except for profits and damages on the unexecuted portion. The claimant has been paid in full for all the work he did, and no quantum meruit is relied upon; but an enforcement of the contract by the recovery of damages, because of the alleged failure on the part of the United States to perform the agreement to the full extent of the alleged con- *393 ' tract. The claimant was paid the sum of $3,775, which was an excess beyond the contract value of the work of $50, and therefore no claim for a quantum meruit can arise.
The judgment of the court is that the petition be dismissed.