CONGRESS CONSTRUCTION COR-
PORATION
v.
The UNITED STATES.
No. 535-59.

United States Court of Claims.
March 6, 1963.

**528**

John T. Koehler, Washington, D. C., for plaintiff. John Paulding Brown, John Geyer Tausig, and Butler, Koehler & Tausig, Washington, D. C., were on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Ramsey Clark, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

Plaintiff was the potential sponsor of a "Wherry Housing Project" which never came to fruition because the Armed Services Committees of the Congress did not approve the acquisition by the Government of the land needed for the project. As such sponsor, plaintiff expended about $220,500 in preparation, and now seeks to recover that sum on the ground that the defendant failed to use its best efforts to obtain the required Congressional approval.

As the court has already pointed out (Henry Barracks Housing Corp. v. United States, Ct.Cl., 281 F.2d 196, 197–198), the Wherry Military Housing Act—Title VIII of the National Housing Act, as added by 63 Stat. 570 (see also 64 Stat. 97, 65 Stat. 365), 12 U.S.C. (1952 ed.) § 1701 et seq.—was enacted to encourage private investors to engage in the construction of rental housing for military and civilian personnel on duty at military installations. The legislation sought to remove the unattractive features of private investment in military housing through (i) a special form of mortgage insurance up to 90 percent of replacement cost; (ii) acquisition by the Government of the buiding sites, followed by a long-term irrevocable lease to the builder; and (iii) assurance that utilities would be provided the project on a long-term basis by the nearby military post. The sticking point in this case, as we shall see, was the acquisition by the Government of the project land for, under a general provision which Congress has long kept in effect, the military departments must "come into agreement" with the Armed Services Committees of the Congress before making fee-title acquisition of real property costing over a stated sum.[1]

This abortive Wherry Housing Project had its origin in 1950, when the Navy requested various builders to submit pro-

---

1. The Act of September 28, 1951, 65 Stat. 365, 40 U.S.C. (1952 ed.) § 551, formalized this requirement as follows:
   "The Secretary of the Army, the Secretary of the Air Force, the Secretary of the Navy, * * * as the case may be, or his designee, shall come into agreement with the Committee on Armed Services of the Senate and of the House of Representatives with respect to those

posals for the housing of naval personnel in the Alameda-Oakland area of California. In the spring of 1952, the Navy determined that a tract owned by plaintiff[2] offered the best possibilities, and by the end of July 1952 authorization was given the local naval official to negotiate with plaintiff for a 500-unit Wherry housing project on this land (which the Government would purchase). During the latter part of 1952, as part of these negotiations, plaintiff submitted to the Navy and the Federal Housing Administration (which had to approve the project if mortgage insurance were to be given) plot plans and building layouts. These were tentatively approved, and plaintiff's formal proposal was made to the Navy on December 10, 1952. After some modifications, the Navy informed plaintiff at the end of February 1953 that the proposal was "generally acceptable." At the end of May 1953, the Navy gave plaintiff the required "Certification of Need" which was a prerequisite to financing through F.H.A.; this certification was made contingent on Navy ownership of the site (which was to be acquired from plaintiff) and it was pointed out that Congressional clearance would be needed for the acquisition; the plaintiff was told that if it chose to go ahead with F.H.A. financing "you must assume the risk of the Navy obtaining favorable action by Congressional Committees for acquisition of the site." By the end of June 1953, the F.H.A. agreed to insure the mortgage on the project if it should ultimately be undertaken.

Both plaintiff and the Navy understood all the while that an indispensable precondition to the consummation of the project was the approval by the Senate and House Armed Services Committees of the purchase of the land from the plaintiff. The Navy came into agreement on terms with plaintiff and prepared the data necessary to obtain the Congressional consent, but it was always clear to both parties that the purchase and the project each hinged on Congressional approval of the land acquisition. The Navy told plaintiff that it "cannot officially accept your offer [relating to the land] nor commit the Navy in any way to such acceptance until the land is approved for acquisition by Congressional Committees"; on the Navy's insistence, plaintiff revised its offer relating to the land so that it was explicitly made subject to the Committees' agreement.

On July 29, 1953, the Navy submitted this land acquisition proposal to the Assistant Secretary of Defense for approval; two days later, on July 31st, the Navy forwarded it to both the Senate and the House Committees. Until early 1953, it had been the Navy's practice to submit its real estate transactions directly to the Congressional Committees, without clearing through the Department of Defense. Late in 1952 or early in 1953, however, a Director of Installations and Logistics (later the Assistant Secretary of Defense for Properties and Installations) was established in the Office of the Secretary of Defense to review all construction projects and property acquisitions (see footnote 6, infra). In February 1953 the Senate Committee informed the Defense Department that it desired that all future requests for committee approval should indicate the concurrence of the Secretary of Defense. Thereafter, the Navy submitted all pending and all new projects to the Secretary. It was pursuant to this changed practice that the Navy forwarded to the Defense Department (in July 1953) the acquisition in which plaintiff was interested. Early in September 1953, the Assistant Secretary of Defense formally required the

real-estate actions by or for the use of the military departments \* \* \* that are described in subsections (a)-(e) below, and in the manner therein described.

"(a) *Acquisition.*

"Acquisitions of real property where fee title is to be acquired for an amount estimated to be in excess of $25,000. \* \* \* "

2. For convenience, we shall refer only to plaintiff, although certain of the transactions were carried on by plaintiff's corporate subsidiaries or the individual who controlled plaintiff.

Navy to submit to him for prior clearance all real estate transactions which had to go to the Congressional Committees.

The gist of the subsequent history is that, despite a full-scale effort by the Navy to convince him,[3] the Assistant Secretary of Defense would not approve the acquisition from plaintiff of the site necessary for the housing project. This led to a checkmate since the Congressional Committees would not proceed to final consideration of the purchase in the absence of further stimulation by the Navy, and the Navy felt itself precluded from urging acceptance upon the Committees until it had obtained clearance from the Defense Department. Ultimately, when it became clear that this higher-echelon approval would not be forthcoming, the Navy formally requested the Committees to permit withdrawal of the proposal (in April 1954). The result was that the entire Wherry Housing Project, of which the land acquisition was an inseparable part, failed to come to life.

Recognizing that the purchase of the land was always contingent upon approval by the Congressional Committees, plaintiff does not assert that the mere failure of the Committees to approve the transaction gave rise to any liability on the Government's part. The primary claim is, rather, that the Navy obligated itself to plaintiff to use its best efforts to obtain such approval, and broke that promise by not going forward before the Committees even though the Defense Department withheld its consent.

At the outset, there is a substantial question, which we leave undecided, whether the Navy *obligated* itself to do anything toward bringing the negotiations to completion. It is clear that there was a coming-together of the Navy and plaintiff on the terms and scope of the proposal, but though it was expected that the Navy would present the matter to the Committees no such express undertaking was given. Perhaps a subsidiary agreement to press further in good faith can be implied, but on the other hand it may be that no legal rights at all—no binding agreement of any kind—would arise until final acceptance by the Committees (see Kilmer Village Corp. v. United States, 153 F.Supp. 393, 396, 397, 139 Ct.Cl. 231, 234–235, 236 (1957)).[4] We pass over this issue, assuming *arguendo* that the Navy was legally bound to plaintiff to make a good faith attempt to persuade the Committees, once plaintiff and the Navy had come to terms.

■ Was this obligation breached because the Navy, bowing to the will of the Defense Department, did not urge approval by the Committees? The plaintiff says that the Defense Department encroached onto an area which, by statute and practice, was solely the Navy's and therefore that the Navy had no legal excuse to submit. It is true that the negotiations were carried on by (or on behalf of) the Secretary of the Navy and that the statute forbidding Navy land acquisition without Congressional consent (see footnote 1, supra) speaks of the Navy's Secretary coming into agreement with the Committees, without mentioning the Secretary of Defense. But when purely executive functions of a discretionary nature are imposed on a subordinate official of the Government it is an implied condition that his actions (before they have become final) are subject to the review and supervision of his superiors— if the superior is authorized to intervene in that particular field and does so in time. Cf. Darragh v. United States, 33 Ct.Cl. 377, 392 (1898). So far as the Presidency is concerned, this is a necessary corollary of Myers v. United States, 272 U.S. 52, 163–164, 47 S.Ct. 21, 71 L. Ed. 160 (1926), holding that Article II of the Constitution "grants to the President

---

3. Plaintiff concedes that the Navy used its best efforts to obtain the approval of the Department of Defense.

4. See also, Carmick v. United States, 2 Ct.Cl. 126, 135 (1866); Darragh v. United States, 33 Ct.Cl. 377, 391 (1898); Cathell v. United States, 46 Ct.Cl. 368, 371 (1911).

the executive power of the Government, i. e., *the general administrative control of those executing the laws*, including the power of appointment and removal of executive officers \* \* \*" (emphasis added). Cf. Humphrey's Executor v. United States, 295 U.S. 602, 627–628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); Wiener v. United States, 357 U.S. 349, 351, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).[5] If the acquisition of plaintiff's land had somehow been called to the President's attention, he would clearly have been within his power in directing the Secretary of the Navy not to seek acceptance of the transaction by the Congressional Committees. Although the statute does not refer to the President in terms, it is implicit in the legislation that he can direct the actions of his subordinate, whom Congress named; "the Secretary of the Navy represents the president, and exercises his power on the subjects confided to his department" (United States v. Jones, 18 How., 92, 95, 15 L.Ed. 274 (1856).

We think that in the circumstances of this case the Secretary of Defense had like authority. By June 1953 Congress had given the Defense Department sufficient power over the Navy so that it had the status of a full superior for the matters with which we are concerned. The Department of Defense had been established as an "Executive Department of the Government" and the Army, Navy, and Air Force as "military departments" "within" it. The Secretary of Defense was designated "the principal assistant to the President in all matters relating to the Department of Defense"; under the President's direction, and subject to certain restrictions (not now pertinent), "he shall have direction, authority, and control over the Department of Defense." The military departments were to be separately administered by their respec-

tive Secretaries, but "under the direction, authority, and control of the Secretary of Defense." Specially detailed provisions were made for Defense Department supervision and control over the budgetary and fiscal procedures and policies of the military departments. See Act of August 10, 1949, 63 Stat. 578, 5 U.S.C. § 171 et seq.

This broad range of statutory authority over the Navy would doubtless have been effective, in itself, to empower the Secretary of Defense (acting through his subordinates, as the law permitted him to do, 5 U.S.C. § 171a(f) to review the Navy's acquisition of land for a Wherry Act project. But there was even more specific statutory delegation of power. A 1951 addendum to the Wherry Act (65 Stat. 365, 12 U.S.C. (1952 ed.) § 1748i), authorizing funds for land acquisitions for Wherry Act housing projects, expressly provided that "[s]uch funds may be expended by the respective military departments for housing projects when the Secretary of Defense, after consultation with the Federal Housing Commissioner, determines that such housing projects should be constructed and that such expenditures are essential to the construction of satisfactory housing." In addition, as we have indicated, a Director of Installations was established in 1952–1953 in the office of the Secretary of Defense to oversee all construction projects and land acquisitions.[6] By Reorganization Plan No. 6 of 1953, effective June 30, 1953, 67 Stat. 638—which had the status of legislation—the functions of the Director were transferred to the Secretary of Defense, who was also authorized to delegate the functions to an Assistant Secretary; the Secretary passed these powers on to the Assistant Secretary for Properties and Installations.

In sum, the Department of Defense was endowed with undeniable supervisory

5. See, also, Marbury v. Madison, 1 Cranch 137, 166, 2 L.Ed. 60 (1803); Wilcox v. Jackson, 13 Pet. 498, 513, 10 L.Ed. 264 (1839); United States v. Jones, 18 How. 92, 95, 15 L.Ed. 274 (1856); Runkle v. United States, 122 U.S. 543, 557, 7 S.Ct. 1141, 30 L.Ed. 1167 (1887).

6. This office was created by the Act of July 14, 1952 (Public Law 534), 66 Stat. 606, 625, which directed the Secretary of Defense to "maintain direct surveillance over the planning and construction by the military departments of all public works projects."

control, general and specific, over the proposed purchase of land from plaintiff. The Assistant Secretary was not an interloper, nor did he trespass on the Navy's authority when he insisted on his right to approve the transaction. And under its authority the Defense Department was not limited to passing upon the need for the housing project, as plaintiff asserts, but could properly consider any and all factors, including the price to be paid for the land. As shown by both its general and its specific grants of authority, the Department had the full scope of a superior officer in the direct chain of command.

■ Since the Defense Department acted lawfully in taking cognizance of this proposed land acquisition, plaintiff is forced to contend that the Navy was nevertheless obligated (by its assumed arrangement with plaintiff) to pursue the matter before the Congressional Committees. This cannot be. To interpret the Navy's implicit agreement to use its best efforts to obtain Committee approval as binding it to by-pass or overrule its superior would contravene a basic canon of proper public administration, acknowledged throughout the nation's history. Subordinates do sometimes seek to undermine their chiefs via the back-door, but it is hard to believe that an official would undertake to do so by a contract obligating the United States, or that such an agreement, if made, would be within the official's power. After the Defense Department took hold of the matter and indicated that its prior clearance was necessary before submission to the Congress, no Navy official could reasonably have been expected to appear before or press

for action by either Committee.[7] That would be stark insubordination. We cannot construe the Navy's promise to use its best efforts to obtain Congressional approval—which we have assumed for this case—to include such unreasonable and improper conduct. It may well be that neither the Navy nor plaintiff foresaw the dominant role taken by the Secretary of Defense, but they must be held to have contracted in the light of that eventuality—foreshadowed by legislation then on the books.

Plaintiff urges, alternatively, that the Navy Department undertook to vouch for the best efforts of the entire Executive Branch, not of the Navy alone. We find nothing, however, in the negotiations between plaintiff and the Navy to suggest that the latter agreed to bind the Defense Department or the President. Both parties appear to have left those superiors entirely out of consideration; at most, the Navy agreed to put forth its own best efforts. Even if the Navy did seek (in advance of the Defense Department's apprising itself of the facts) to constrain the latter to persuade the Committees, we know of no authority by which a subordinate official can bind a superior, who has not yet considered a matter which he has a right to see before final action, to take a certain position. That would turn the administrative hierarchy upside-down.

The plaintiff has not shown that any obligation to it undertaken by the defendant has been breached. Its expenditure of funds in anticipation of the final contract does not change the result. "It is probably the rule rather than the exception that money is spent and not

7. Plaintiff does not rely on the provision of the act establishing the Defense Department which declares that "[n]o provision of this Act shall be so construed as to prevent a Secretary of a military department or a member of the Joint Chiefs of Staff from presenting to the Congress, on his own initiative, after first so informing the Secretary of Defense, any recommendations relating to the Department of Defense that he may deem proper." 5 U.S.C. § 171a(c) (8) (for-

merly 5 U.S.C. § 171a(c) (6)). This section, obviously intended for important matters of policy, was not designed to encourage the military departments to "appeal" any decision of the Defense Department, no matter how minor, to the Congress. The Navy's agreement to use its best efforts would not include a promise to use the extraordinary avenue of communication opened by this section.

recovered in circumstances where a contract is not consummated." Kilmer Village Corp. v. United States, 139 Ct.Cl. 231, 236, 153 F.Supp. 393, 397 (1957); see also Abbell v. United States, 143 Ct. Cl. 556, 561, 166 F.Supp. 602, 606 (1958); Carmick v. United States, 2 Ct.Cl. 126, 135 (1866).

Plaintiff is not entitled to recover. The petition will be dismissed.