Davis, Judge,
concurring in part and dissenting in part:
Affiliated broke the contract when its plant manager and other employees deliberately by-passed the defendant’s inspection system and palmed off rejected shells as though the *687 inferior goods bad met tbe Government’s test. This was a deliberate and serious fraud on the Government, materially. breaching the agreement and subjecting Affiliated to cancellation for default. Only in the rarest of cases could a serious fraud fail to be a substantial breach; in this instance the materiality of the breach seems patent.[8] Nor is it an excuse that the company’s higher officers were wholly innocent of the misrepresentation and the breach. The contractor is tarred by its operating employees’ conduct under the contract, just as it would be held liable if they had made poor shells or failed to produce the required number. See Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 355-57 (1929); United States v. United States Cartridge Co., 198 F. 2d 456, 464 (C.A. 8, 1952), cert. denied, 345 U.S. 910 (1953); United States v. George F. Fish, Inc., 154 F. 2d 798, 801 (C.A. 2), cert. denied, 328 U.S. 869 (1946); Ricketts v. Pennsylvania R. Co., 153 F. 2d 757, 759 (C.A. 2,1946).
The central question, to me, is whether the defendant waived the breach. The record suggests that the Ordnance Department, both in the field and in Washington, initially desired to waive the breach and to continue production under the contracts, provided that Affiliated met the conditions stated in finding 22. If Ordnance had the authority to overlook the violation, I would find it hard to deny that it effectively did so through its letter of November 17, 1953, and the ensuing actions between that date and the end of the month (findings 22-24). Ordnance imposed specific conditions for resumption; the contractor agreed without qualification. That may very well have been enough to reinstate the contract — if Ordnance had that power. See Freedman, v. United States, 162 Ct. Cl. 390, 397-98, 320 F. 2d 359, 363-64 (1963).[9]
Plaintiff’s theory of a consummated agreement-waiving-the-breach founders, however, on the jagged coast of lack- *688 of-authority. Neither the Ordnance contracting officer nor the Chief of Ordnance was empowered to disregard the breach or to reinstate the contract. At that time, there was in effect within the Department of the Army a procedure under which any situation seeming to involve fraud in connection with an Army contract had to be forwarded by the chief of the technical service (i.e., Ordnance) to the Assistant Secretary of the Army (Materiel), who was vested with final authority to determine the action which should be taken. See finding 18. That rule operated to deprive the Chief of Ordnance of power to make the agreement to which plaintiff refers. Among the most ancient of the principles of federal procurement is that the Government is not bound by the agreement of an agent or officer without actual authority — even though he would be held to have apparent authority if the private law of agency controlled.[10] The contractor has the burden of discovering the true extent of the authority of the Government men with whom he deals.
Affiliated did not know (it appears) that final power to reinstate the contract had been withheld from the Ordnance Department, but the rule of actual authority has never been confined to contractors who knowingly make agreements with unauthorized officers. Moreover, the contractor here was not unaware that there was a problem of authority. Its representative was early told that the final decision on whether Affiliated would be permitted to resume production under the contract would be made “in Washington” (finding 21). The matter was plainly beyond the contracting officer’s sphere; and Affiliated so understood. The phrase “in Washington” may have meant the Office of the Chief of Ordnance, but it may also have referred to a higher echelon within the Army or the Defense Department; at the least, Affiliated was put on notice that someone at the Seat of Government would have the final word. So far as we know, the contractor did not seek to discover what officer “in Washington” had that power. Plaintiff assumed, without inquiry, that it was *689 enough, to obtain the concurrence of the Office of the Chief of Ordnance. Now that that assumption has turned out to be invalid under the Army’s procedure, plaintiff necessarily finds itself relying on an asserted agreement with a level of the Department of the Army which was not authorized to act where fraud was suspected.
Harsh though the rule of actual authority may sometimes seem, it serves important ends in a case like this. The Department of the Army evidently thought that fraud in procurement required the attention of the next-to-highest echelon in the agency, on the Secretarial level. The procuring services were not to be free to decide for themselves whether the contract should be reinstated or the breach waived. Those services are often preoccupied with a pressing need for the supplies, and less concerned with the overall considerations of general policy which the Department must have thought should govern fraud cases. Departmental rules and policies are to be vindicated in procurement as in other fields. See G. L. Christian & Associates v. United States, 160 Ct. Cl. 58, 320 F. 2d 345 (1963), cert. denied, 375 U.S. 954 (1963). It is important that “procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials, or by a concert of contractor and contracting officer.” 160 Ct. Cl. at 66, 320 F. 2d at 351. To permit this contractor to stand on an agreement-to-resume made with Ordnance, in the teeth of the requirement that the Assistant Secretary pass upon that very question, would fail “to protect the significant policies of superior administrators from sapping by subordinates.” Ibid.
It remains to say, on this point, that there is nothing in the record or the recommended findings to indicate that the Assistant Secretary actually knew or approved of any agreement between Ordnance and Affiliated to resume production (or to prepare to resume production). Nor, in view of his manifold duties and responsibilities, is there reason to believe that the Assistant Secretary was (or should have been) fully cognizant — before he came to consider and decide the matter in the middle of December 1953 — of Ordnance’s deal *690 ings with this particular company on this contract from the time the fraud was discovered at the end of October 1953.[11] In any event, the Assistant Secretary certainly cannot be said to have ratified any agreement between Ordnance and the contractor in November 1953. It was not until December 1, 1953 that the Chief of Ordnance made his recommendation to the Assistant Secretary to continue the contract under specified conditions; that recommendation evidently assumed that approval had not yet been given.
The Assistant Secretary thereafter acted with reasonable promptness in a case of this kind. He refused to reinstate the contract and ordered it cancelled for default. He determined, on December 16, 1953, that “the contract will be terminated, for default if the legal basis may be found” and that “Ordnance will take immediate steps to remove the production line from the plant and place it in storage” (finding 30). The formal letter sent to Affiliated on December 29, 1953, stated, after a reference to the fraud, that “by reason of such contract and statutory violations, you are advised that the contract is canceled” (finding 34). It is true that this letter avoided using the term “default,” and that Affiliated was told by Army representatives, shortly thereafter, that the letter “left open for a final determination the default, repudiation, or termination for the convenience of the Government of the contract” (finding 35). But it is clear to me, particularly from the testimony of the Assistant Secretary and the Assistant Judge Advocate General,[12] that the former *691 definitely intended to terminate the contract for default— not to reinstate it, or to end it for the defendant’s convenience. Since Affiliated had actually defaulted, the Secretary’s subjective purpose is consistent with his written determination that the contract was to be terminated for default “if the legal basis may be found,” as well as with the formal declaration to Affiliated (on December 29th) that “by reason of such contract [ual] and statutory violations, you are advised that the contract is canceled.” If the contractor was momentarily soothed into giving these words less than their face value, it soon became clear that the defendant deemed the contract ended — and not for the Government’s convenience or because of the Government’s fault.
It follows, in my opinion, that plaintiff is entitled to recover nothing on account of the termination of the contract. The agreement was cancelled for a default which had actually occurred. To the extent that the court refuses the recovery plaintiff! seeks, I concur in the judgment.[13]
I do not concur, however, with the majority when it finds a separate, supplemental agreement to reimburse plaintiff! for Affiliated’s costs incurred, during December 1953, in meeting the conditions specified by the Ordnance Department in its letter of November 17th. There could be no such supplemental agreement with Ordnance for the same reason there could be no valid agreement to reinstate the main contract; the rule which vested the Assistant Secretary with final authority in fraud cases deprived Ordnance of all power to bind the United States to pay Affiliated for rearranging its plant and operations to accommodate a prospective resumption of operations. There is, in addition, no evidence that either party considered that it was entering into a supplemental pact. No such agreement was formally made and there is no course of dealings from which a contract implied-in-fact could be inferred. It appears, rather, *692 that Affiliated was so certain that the production contract would be reinstated that it undertook these expenses in the confident expectation that they would not be for naught, or Affiliated may well have felt (as it now argues) that it had already obtained an agreement to reinstate the shell contract. Ordnance seems to have been of a similar mind. Both the contractor and the agency failed to take account of the significant role of the Assistant Secretary. Affiliated was probably unaware of his participation; in November and early December, Ordnance apparently anticipated his certain approval of a continuation of the contract. Cf. Congress Constr. Corp. v. United States, 161 Ct. Cl. 50, 314 F. 2d 527 (1963), cert. denied, 375 U.S. 817 (1963).
Perhaps if we could utilize the broad concepts of fairness, grace, and “equity” which have sometimes characterized our Congressional reference cases of the past, we would hold that plaintiff should be compensated for Affiliated’s out-of-pocket expenditures in reliance on what Ordnance told it in November 1953. But this is a case, presented and tried under our general jurisdiction, in which we can grant judgment only on a claim kn own to the law. In my view, the demand which the court satisfies with a judgment is not a legal claim which we should recognize as such. I would allow no recovery.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Syracuse, New York. The plaintiff is the surviving corporation in a statutory merger by which Affiliated Gas Equipment, Inc., a Delaware corporation (which will be referred to hereafter in the findings as “Affiliated”), was merged into the plaintiff on February 28, 1955. Coincident with the merger of Affiliated into the plaintiff, the United States entered into a Tripartite Supplemental Agreement with Affiliated and the plaintiff whereby the United States accepted the plaintiff as the successor to Affiliated under the contracts between the United States and Affiliated, with the *693 same force and effect as if the plaintiff had been named the contractor.
2. (a) On July 31, 1951, Affiliated entered into contract No. DA-33-019-ORD-506 (referred to hereinafter as “contract 506”) with the Ordnance Corps of the Department of the Army (referred to hereinafter as “Army Ordnance”), acting on behalf of the United States, for the manufacture and delivery of the projectile parts of high-explosive 90 mm. T-91 shells.[14] Contract 506 was a negotiated contract. It originally called for the manufacture and delivery of 139,105 shells at a unit price of $6.97 per shell, or a total contract price of $969,561.85. Deliveries under this contract were to commence upon the completion of an earlier contract, No. DA-33-019-ORD-131 (referred to hereinafter as “contract 131”), between the same parties for the manufacture of T-91 shells; and contract 506 further provided in this connection that “deliveries hereunder shall be completed within a reasonable time, the exact rate of delivery to be negotiated by the parties and incorporated into this Contract by Supplemental Agreement.”
(b) Contract 506 contained the following additional provisions (among others):
ARTICLE NO. 5 INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be cor *694 rected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shan not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided in the clause of this contract entitled “Default”. Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes”.
(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government, provided, that in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Gov-erment shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made a [sic] promptly as practicable after delivery, except as otherwise provided in this contract ; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
*695 (d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the supplies hereunder. Records of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract. (ASPE 7-103.5)
# # ‡
ARTICLE NO. 11 DEFAULT
(a) The Government may, * * * by written Notice of Default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances.
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof, or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
ifc íJí ifc
(f)The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract. (APP & ASPR 7-103.11)
ARTICLE NO. 12 DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal *696 by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and. in accordance with the Contracting Officer’s decision. (APP & ASPE 7-103.12)
* * *• * * * *
AETICLE NO. 25 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT.
(a) The performance of work under this contract may be. terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than one year from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer upon request of the Contractor made in writing within such one year period or authorized extension thereof. Upon failure of the Contractor to submit its termination claim within the time allowed, the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination.
(d) Subject to the provisions of paragraph (c), the Contractor and the Contracting Officer may agree upon the -whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial *697 termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit, but only on work done in connection with the terminated portion of the contract. The contract shall be amended accordingly, and the Contractor shall be paid the agreed amount. * * *
(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in para-
?raph (d) upon the whole amount to be paid to the lontractor by reason of the termination of work pursuant to this clause, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (d), shall pay to the Contractor the amounts determined as follows:
(1)For completed supplies accepted by the Government and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges;
(2)The total of:
(i)the costs incurred in the performance of the work terminated, exclusive of any costs attributable to supplies paid or to be paid for under paragraph (e) (1) hereof;
(ii)the cost (which may include a reasonable allowance for profit to subcontractors or vendors, but only on work done in connection with the terminated portion of any subcontract or order) of settling and paying claims arising out of the termination of work under subcontracts or orders, * * * which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts should be included in the costs payable under (i) above), provided that:
(A) Each such claim has been settled with the written approval of the Contracting Officer; or
‡ ‡ ‡ ^ ‡
(iii)a sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under (i) above.
(3)The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonable *698 [sic] necessary for tlie preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of termination inventory.
# Hí # ‡
(f) The Contractor shall have the right of appeal, under the clause of this contract entitled “Disputes”, from any determination of the amount due to the Contractor made by the Contracting Officer under paragraphs (c) or (e) above, except that if the Contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of that amount due under paragraph (c) or (e) above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal; any such determination being final and conclusive upon the Contractor and the Government.
* * $ $ ‡ ‡ $
ARTICLE NO. 38 DEFAULT — LIQUID AT ED DAMAGES.
*******
_ (g) The rights and remedies of the Government provided in this clause shall not be exclusive, and are in addition to any other rights and remedies provided by law or under this contract. (ASPE 1-103.11 — APP & ASPE 7-105.5)[15]
3. The quantity and the total price of the shells to be manufactured under contract 506 were increased by supplemental agreements. Supplemental Agreement No. 23, dated June 26, 1952, increased the contract quantity from 139,105 shells to 604,105 shells and the total contract price from $969,561.85 to $4,210,611.85. Supplemental Agreement No. 41, dated March 31, 1953, increased the contract quantity to 800,105 *699 shells and the total contract price to $5,773,515.85. Supplemental Agreement No. 50, dated May 28,1953, increased the contract quantity to 1,117,105 shells and the total contract price to $8,169,718.85. As the result of price redetermina-tions, Supplemental Agreement No. 56, dated August 20, 1953, decreased the contract price by $6,360, and Supplemental Agreement No. 59, dated August 31, 1953, increased the contract price by $29,075.65, thus making the final total contract price $8,192,434.50.
4. Affiliated began deliveries of shells under contract 506 in June 1953.
5. By Supplemental Agreement No. 61, dated September 11, 1953, the actual delivery of shells by Affiliated under contract 506 during the period from June 1953 through August 1953 was established as the delivery schedule for that period; and the subsequent delivery schedule was established at 80,000 shells per month for the period from September 1953 through July 1954, and at 63,359 shells for the final month of August 1954.
6. On October 30, 1953, Army Ordnance delivered to Affiliated the following written stop order relative to contract 506:
In view of information to the effect that your company has delivered substantial quantities of unacceptable material to the Government under the above contract, you are hereby notified that the Government will not accept any additional shell produced by you until further notice.
7. (a) At the time when the written stop order ref erred to in finding 6 was issued by Army Ordnance to Affiliated, the latter had manufactured and delivered to Army Ordnance a total of 323,414 shells under contract 506.
(b) The 323,414 shells mentioned in paragraph (a) of this finding have been paid for by Army Ordnance on the basis of the unit price provided for in contract 506.
8. The reason for the issuance of the stop order referred to in finding 6 was the discovery by Army Ordnance that, under the circumstances related in subsequent findings, certain personnel employed by Affiliated in connection with the performance of contract 506 had devised and perpetrated *700 a scheme whereby shells which failed to meet the specifications of the contract were delivered to Army Ordnance without first having been submitted to and passed by the appropriate Army Ordnance inspectors in accordance with the inspection procedure established and maintained by Army Ordnance pursuant to Article 5 of contract 506.
9. (a) The production of T-91 shells under the successive contracts 131 and 506 was performed by Affiliated at a plant operated by its Bryant Heater Division on London Boad in Cleveland, Ohio.
(b) Affiliated operated the London Boad plant on a 2-shift basis in producing T-91 shells. The second shift completed its work at about midnight, and production activities at the plant ceased at that time for the remainder of the night.
10. (a) Pursuant to the inspection article of each of the successive contracts 131 and 506, Army Ordnance established and maintained an inspection procedure at Affiliated’s London Boad plant. It was based on the standard Army Ordnance inspection procedure in effect at the time, and it involved the establishment and maintenance of three inspection stations, manned by Army Ordance inspectors, at three different points on Affiliated’s production line. The stations were officialy designated as Classification of Defects Stations • Nos. 1,2, and 3, but they were commonly known as “CD-I,” “CD-2,” and “CD-3.” At each station, shells were inspected in lots on a sampling basis for certain defects, which were categorized (in a descending scale of seriousness)' as critical, major, or minor.
(b) The first inspection by Army Ordnance inspectors was performed at CD-I, where the body of the shell, prior to banding, was inspected. It was necessary for a lot of shells to pass inspection at CD-I as being acceptable under the specifications of the contract with respect to the factors for which the shells were inspected at CD-I, in order for the lot to proceed further along Affiliated’s production line.
(b) If a lot of shells passed inspection at CD-I, the shells were subjected by Affiliated’s production personnel to the remainder of the prescribed manufacturing operations (except painting) before the lot was inspected by Army Ord *701 nance inspectors at CD-2. The inspection that was performed at CD-2 related to the metal parts assembly of the shell, prior to painting. Shells were inspected at CD-2 for (among other defects) impermissible variations in wall thickness. It was necessary for a lot of shells to pass inspection at CD-2 as being acceptable under the specifications of the contract with respect to the factors for which the shells were inspected at CD-2, in order for the lot to proceed further along Affiliated’s production line.
(d) If a lot of shells passed inspection at CD-2, the shells were painted by Affiliated’s production personnel, and the finished shells were then given a final inspection by Army Ordnance inspectors at CD-3. It was necessary for a lot to pass inspection at CD-3 as being acceptable under the specifications of the contract with respect to the factors for which the shells were inspected at CD-3, in order for the lot to be delivered by Affiliated and accepted by Army Ordnance under the contract.
11. Affiliated, through its own inspectors, conducted in-process inspection at each of the many machining operations on the shell; and Affiliated’s inspectors■ conducted a final inspection after all the machining operations had been performed on the shell and immediately preceding the Army Ordnance inspection at CD-2. Affiliated had from 20 to 25 inspectors on each shift, with an inspector at each of the machining operations, in addition to the operator. At Affiliated’s final inspection, all outside dimensions were checked on all shells by the multicheck, an automatic electric testing gauge. Hand-operated gauges were used to check wall, variation. In practice, every other shell was tested for wall variation, but if two or three shells in a lot were found to be over the allowable dimension, each shell was checked until the quality improved. All shells were visually inspected for various characteristics at Affiliated’s final inspection.
12. (a) Under the inspection procedure that was established and maintained by Affiliated, shells that failed to pass the final inspection by Affiliated’s inspectors were taken off the production line by such inspectors and were not submitted to the Army Ordnance inspectors at CD-2. Affiliated’s inspectors marked the defective shells in such a way *702 as to indicate the nature of the defects. The defective shells were then taken to the Salvage Department of the London Eoad plant, where they were segregated and placed in separate bins on the basis of: (1) whether the defects could be corrected by further machining so that the shells would then meet the specifications of the contract (such shells were known as “salvage shells”); or (2) whether, although the defects could not be corrected by further machining, the departures from the specifications were nevertheless of such a marginal nature that Army Ordnance might reasonably be expected, on the basis of a request for a deviation submitted by Affiliated, to accept the shells (such shells were known as “deviation shells”); or (3) whether the defects could not be corrected by further machining and were of such a serious nature that there was no reasonable expectation that the shells might be accepted by Army Ordnance upon the basis of a request for a deviation submitted by Affiliated (such shells were known as “scrap”).
(b) Affiliated’s procedure contemplated: (1) that salvage shells would be machined further in order to correct the defects and would then be submitted to the Army Ordnance inspectors at CD-2; (2) that when a group of deviation shells had been assembled, it would be made the subject of a request to Army Ordnance for a deviation, and the shells would be held in the Salvage Department pending action on the request; and (3) that the other defective shells would be disposed of as scrap.
13. (a) Army Ordnance established the following procedure for the examination and consideration of requests from Affiliated for deviations: (1) Affiliated was required to fill out a prescribed form (DA Form 695) with respect to a batch of shells on which it wished to request a deviation (i.e., acceptance of the shells despite slight departures from the requirements of the specifications). (2) The form was submitted by Affiliated to Army Ordnance’s chief inspector at the London Eoad plant, who, if he believed the information to be accurate, signed the form and certified that the information was correct. (3) The form was then sent to the headquarters of the Cleveland Ordnance District, where the request was reviewed by the chief inspector of the Dis *703 trict, who made a recommendation. (4) The request was next forwarded to the ammunition center which had the technical responsibility for the contract, and the center made a recommendation respecting the approval or denial of the request. (5) The request was next submitted to the contracting officer, who made the final decision regarding the approval or denial of the request.
(b) A copy of the contracting officer’s action, whether favorable or unfavorable, was furnished to Affiliated, and a copy was also furnished to Army Ordnance’s chief inspector at the London Road plant.
(c) Most of the requests for deviations submitted by Affiliated were granted by Army Ordnance.
(d) The various steps outlined in paragraphs (a) and (b) of this finding constituted a time-consuming process. A period of iy2 or 2 months generally elapsed between the submission of a deviation request by Affiliated and the receipt of a copy of the contracting officer’s decision on the request. In the meantime, the deviation shells involved in a request were being held in Affiliated’s Salvage Department while awaiting the final action on the request.
14. Throughout the entire period of the production of T-91 shells under the successive contracts 131 and 506, Affiliated encountered difficulty in attempting to meet, and generally was unable to meet, the prescribed delivery schedule. One reason was that the T-91 shell was, from the technical standpoint, a difficult shell to produce. Another factor was the inability of Affiliated, despite its reasonable diligence in this respect, to secure a supplier or suppliers that could furnish forgings for the shells in the quantity and of the quality needed by Affiliated. The forgings obtained by Affiliated were apt to be marred by sharp edges, teats, and inclusions, and it was necessary to eliminate such defects by the process of grinding. The grinding frequently caused shells to vary impermissibly from the requirements of the specifications as to wall thickness.
15. The specifications of each of the successive contracts 131 and 506 prescribed a specific thickness for the wall of the T-91 shell, but provided for an allowable tolerance. At *704 the outset of the production of T-91 shells under the contract 131, the permissible variation in the wall thickness was .03 inch, but this was later increased to .04 inch. If a particular shell varied from the prescribed wall thickness by more than the allowable tolerance due to the grinding referred to in finding 14, or for any other reason, it was a defective shell and would not pass inspection. However, the departures from the allowable tolerance were generally slight, and it was customary for these shells to be considered as deviation shells and to be subjected to the procedure referred to in finding 13. Bequests for deviations were usually granted by Army Ordnance as to such shells.
16. (a) Beginning in December 1952 (when Affiliated’s London Boad plant was engaged in the production of T-91 shells under contract 131) and continuing through the greater part of October 1953 (when the London Boad plant was engaged in the production of T-91 shells under contract 506), certain supervisors who were employed by Affiliated at the London Boad plant devised and carried out a scheme which, in their thinking, was designed to “cut red tape” and to assist Affiliated in its attempt to meet the delivery schedule. A few of the workmen who were employed by Affiliated at the London Boad plant performed the manual labor that was involved in carrying out the scheme. The details are set out in the following subparagraphs:
(1) Sometime after midnight, when the second shift at the London Boad plant ha,d completed its work, and all production activities at the plant had ceased, and the Army Ordnance inspectors had left the plant, persons involved in the scheme would go to the Salvage Department, take deviation shells out of the bin or bins in which they were stored while awaiting the preparation of a deviation request by Affiliated, eliminate the markings that indicated the nature of the defects, and arrange the shells in the form of one or more pallets.[16] The pallet or pallets of deviation shells would be transported to the place behind CD-2 where shells which had passed inspection by Army Ordnance inspectors at that station were stored before being painted and processed fur *705 ther; and the pallet or pallets of deviation shells wonld be deposited there, as though they, too, had passed inspection at CD-2. In order that the production statistics might not be put out of balance, an equivalent number of shells which had actually passed inspection at CD-2 would be removed from this storage area, would be taken to the Salvage Department, and would be left in that department.
(2) The next day, the shells which had been taken from the storage area behind CD-2 and deposited in the Salvage Department would be resubmitted to the Army Ordnance inspectors at CD-2 in the guise of salvage shells that had been machined further in order to correct remediable defects.
(3) The deviation shells which had been deposited in the storage area behind CD-2 without having passed inspection at that station would subsequently be painted along with the other shells in that area, and ultimately would be delivered to Army Ordnance after passing inspection at CD-3. (The defects which had caused the shells to be classified as deviation shells did not relate to factors for which shells were inspected by Army Ordnance inspectors at CD-3.)
(b) Affiliated’s supervisors at the London Eoad plant who were involved in the scheme included the plant manager, the superintendent of production, the chief inspector, two foremen in the Inspection Department, and a foreman in the Salvage Department.
(c) The supervisors who were involved in the scheme did not receive any extra pay for the overtime work that they did in carrying it out. However, the workmen who assisted in carrying out the scheme did receive overtime pay for such work.
(d) None of Affiliated’s officers participated in the scheme or was aware of it until after the scheme had been discovered by Army Ordnance, as indicated in finding 17. Affiliated’s officers cooperated fully in the investigation that is mentioned in finding 17.
(e) The switching of shells was not performed on a nightly basis. Rather, it was performed only a few times each month, and usually near the end of the month, when information was available regarding the prospective deficiency for the month in the meeting of the delivery schedule.
*706 (f) The persons involved in the scheme were motivated by a desire to assist Affiliated in its attempt to meet the delivery schedule. They believed that the deviation shells which they switched for shells that had passed inspection by Army Ordnance inspectors at CD-2 were shells that would have been accepted by Army Ordnance if they had been made the basis of deviation requests under the time-consuming procedure referred to in finding 13; and they further believed that they were “cutting red tape” in effecting the delivery of such shells without going through the prescribed procedure for the handling of deviation shells.
17. On October 23,1953, Army Ordnance received from a newspaper reporter in Cleveland its first information regarding the scheme mentioned in finding 16. The matter was promptly investigated, and the investigation established that Army Ordnance’s inspection procedure at Affiliated’s London Eoad plant had been short-circuited in the manner indicated in finding 16, and that, as a result, many shells which failed to meet the specifications of contract 506 had been delivered to Army Ordnance. Thereupon, Army Ordnance issued to Affiliated on October 30, 1953, the stop order that is set out in finding 6. Affiliated immediately discontinued the production of T-91 shells.
18. At the time of the discovery by Army Ordnance of the scheme referred to in finding 16, there was in effect within the Department of the Army a procedure whereby a contracting officer was required to report promptly to the chief of the appropriate technical service (the Chief of Ordnance in so far as Ordnance contracts were concerned) any situation that seemed to involve fraud in connection with an Army contract. The chief of service was required to forward the report to the Assistant Secretary of the Army (Materiel)', who was vested with final authority to determine the action that should be taken. Such a report concerning the scheme referred to in finding 16 was prepared by the contracting officer in charge of contract 506,[17] and was transmitted through channels to the Assistant Secretary of the Army (Materiel).
*707 19. On November 3, 1953, James A. Hughes, an officer of Affiliated, communicated by telephone with the contracting officer and sought an appointment for the purpose of discussing the resumption of production under contract 506. A conference was arranged for the following day.
20. On November 4,1953, after the telephone conversation referred to in finding 19 and before the conference mentioned in finding 21, the contracting officer communicated by long-distance telephone with his immediate superior, the Chief of the Industrial Division, Office of the Chief of Ordnance, Department of the Army, Washington, D.C., and informed the latter regarding the contact that had been made by Mr. Hughes. The Chief of the Industrial Division told the contracting officer that there was no objection to the proposed discussion. However, the Chief of the Industrial Division orally outlined several conditions that Affiliated would have to meet before any approval would be granted for the resumption of production under contract 506: (1) it must appear that the top management of the company was not involved in the scheme that had led to the issuance of the stop order; (2) it would be necessary for Affiliated to discharge the persons who were involved in the scheme; and (3) it would be necessary for Affiliated to reimburse the Government for any damages that had been sustained.
21. A conference was held on November 4, 1953, between the contracting officer and James A. Hughes. At that conference, the contracting officer informed Mr. Hughes that the final decision on whether Affiliated would be permitted to resume production under contract 506 would be made in Washington. The contracting officer outlined the conditions which the Chief of the Industrial Division, Office of the Chief of Ordnance, had mentioned as prerequisites to the granting of permission for the resumption of production under contract 506.
22. Under the date of November 17,1953, the Chief of the Industrial Division, Office of the Chief of Ordnance, acting on behalf of the Chief of Ordnance, sent to the contracting officer a communication stating as follows:
1. Confirming conversation * * * on 4 November 1953, it is agreed that production may be reinstituted on *708 Bryant Heater contracts provided the following conditions are met:
a. Investigation discloses that top management of the parent company, Affiliated Gas Equipment Corp., is not in any way involved.
b. Each individual who is shown to be involved is immediately removed from employment at the plant.
c. The Bryant Heater Division accepts monetary responsibility for any excess costs incurred due to this incident involving the acceptance of non-conforming material.
2. Notification should be furnished of action taken in in accordance with the above.
23. Soon after November 17, 1953, the contracting officer and James A. Hughes had a further conference concerning the resumption of production under contract 506. At that conference, the contracting officer informed Mr. Hughes of the receipt and contents of the communication referred to in finding 22. Mr. Hughes stated that Affiliated was prepared to meet all the conditions outlined in the communication dated November 17, 1953. The contracting officer and Mr. Hughes discussed the sort of letter that might appropriately be sent to Affiliated by Army Ordnance for the purpose of authorizing the resumption of production under contract 506.
24 Under the date of November 24, 1953, the contracting officer submitted to the Office of the Chief of Ordnance a draft of a proposed letter that had been prepared for possible transmisión to Affiliated in order to authorize the resumption of production under contract 506, and the draft of a proposed news release that had been prepared for issuance to the press in connection with this matter. The covering communication from the contracting officer stated in part as follows:
2. The proposed letter and news release are believed to be in compliance with * * * [the letter of November 17,1953] and are designed to preserve the Government’s present position completely while permitting the provisional resumption of production subject to whatever further action the Government may desire to take when it has received additional or final information or reports.
3. The Government has a substantial investment in facilities at the plant, and approximately 500 people *709 are unemployed during this shut-down. Representatives of this office were advised in your office last week that the Board of Inquiry is finding that the shells in question are safe for use and accurate within the designed purpose. The passage of time might enhance or create rights m the Company and react unfavorably against Ordnance.
4. It is the opinion of this office that prompt action should be taken in accordance with the proposed letter and news release unless your office is in possession of information unknown to this office which would indicate otherwise. This office will withhold further action in this regard until advice of your office has been received.
25. On December 1,1953, the Chief of Ordnance forwarded to the Assistant Secretary of the Army (Materiel) the drafts mentioned in finding 24 and a report on the reinspection of six carloads of shells previously delivered by Affiliated to Army Ordnance. The Chief of Ordnance discussed the results of this reinspection, and then stated:
2. * * * In the absence of some unexpected development, it is not contemplated that shells which have been loaded, will be reinspected. The defects thus far discovered are not such as to endanger the safety of the troops.
3. It is the recommendation of this office that Ordnance be authorized to continue this contract and to resume inspection under instant contract subject to the conditions hereafter stated. * * *
26. In the expectation that the resumption of production under contract 506 would be authorized by Army Ordnance, Affiliated restaffed the London Road plant with a new plant manager and supervisory personnel, and notified one of the forging suppliers to resume production on a limited basis. A test run of 600 shells through every operation was made in order to provide the statistical data necessary for the installation of process control charts on the machines producing each critical dimension, 'after the anticipated reopening of the plant.
27. On December 11, 1953, the contracting officer reported' to the Chief of Ordnance in part as follows:
2. In accordance with your request, we have * * * conducted a plant survey to check the methods which the contract [sic] proposes to utilize to maintain quality in production of the 90MM Shell.
*710 3.Our review and survey indicate that the new plant management staff has taken adequate preparatory measures to attain a quality product. The expressed intention of controlling quality by defect prevention during processing will, when placed into operation, show results in the quality of the end item.
28. On December 15,1953, the Chief of Ordnance wrote to the Assistant Secretary of the Army (Materiel), and stated in part as follows:
3. It is suggested that immediate action be taken to arrange for a meeting between company officials and representatives of OJAG and Ordnance in order that negotiations to effect the resumption of inspection and acceptance of the production will not be longer delayed.
4. This suggestion is made despite the lack of a statement from the Criminal Division of the Department of Justice. Sufficient time has elapsed since the conference with representatives of that division for it to submit an opinion. Since the essentiality of the production of subject company is such that regardless of the opinion, of the Criminal Division, defense interests will require that this office recommend resumption of contract relations with Affiliated Gas, Inc. It is the opinion of this office that there is nothing to be gained by further delay and the recommendation for immediate action is therefore made. * * *
5. This office also desires to point, out that investigation has not developed evidence to indicate that top management of Affiliated Gas, Inc. was involved in this matter, even though the corporation may legally be both civilly and criminally responsible and that the company by letters has outlined actions which it is taking to purge its organization of the persons involved in the conspiracy.
29. On December 16, 1953, the problem of the action that should be taken in connection with contract 506 was discussed at a conference that was attended by the Under Secretary of the Army and representatives of the Office of the Chief of Ordnance and of the Office of The Judge Advocate General of the Army. Among other matters discussed at the conference was the fact that there had developed a cutback in the requirements of the Army for the T-91 shell. The conferees discussed three alternative methods of terminating contract 506: (a) on the basis of Affiliated’s default; or (b) for the convenience of the Government; or (c) on the *711 basis of the repudiation by Affiliated of its contract obligations by reason of a breach of a material condition of the contract. It was the conclusion of the conferees that, in view of the alleged fraud on the part of Affiliated and the contemporaneous cut-back of requirements for the T-91 shell, the appropriate termination procedure was open to question.
30. On December 16, 1953, the Assistant Secretary of the Army (Materiel) made the following decisions regarding contract 506:
a. The contract will be terminated, for default if the legal basis may be found.
d. The Government will continue to withhold the sums due the Company, as a basis for recoupment of any charges against the company.
c. There will be no suspension of the Company or officers thereof.
d. Ordnance will take immediate steps to remove the production line from the plant and place it in storage.
31. On December 18, 1953, the Office of the Chief of Ordnance sent the following telegram to the contracting officer relative to contract 506:
REFERENCE LETTER FROM THIS OFFICE DATED 17 NOV 63 SUBJECT CONTRACT WITH BRYANT HEATER FOR 90MM SHELL CMM BECAUSE OF CHANGE IN CONDITIONS CMM PROVISIONS OF THE CITED LETTER ARE COMPLETELY WITHDRAWN PD ADDITIONAL INSTRUCTIONS WILL BE FURNISHED
32. (a) On December 23, 1953, the Office of the Chief of Ordnance proposed to higher authority that a letter containing the following paragraphs be sent to Affiliated:
As a result of contractor actions, under which rejected shells were processed in violation of Government inspection and acceptance provisions of Contract No. DA-33-019-OBD-506, as implemented by standard inspection procedures governing such shell deliveries, certain Army reports have been processed through Department of the Army channels to the Department of Justice. Considerations of Government actions on contract and statutory violations are now pending in the Department of the Army and the Department of Justice.
You were advised by the District on 31 October 1953 that no further Government inspections would be made pending re-inspection of certain lots of shells processed *712 during the time period December 1952 through October 1953. Ee-inspection in this regard is still under way.
By reason of the contract and statutory violations, and with consideration given to changes in requirements of this class of shell, you are advised that the contract is terminated.
Inasmuch as the rights of the Government in connection with the foregoing contract and statutory violations are under study by the Department of the Army and Department of Justice, you are advised that any further payments under this contract will be handled in accordance with the procedure for handling claims of a doubtful nature arising under contracts.
Claims, if any, to be presented by you with respect to this contract No. DA-33-019-OBD-506 will therefore be processed through the contracting officer and thence through Army channels to the TJ.S. General Accounting Office for final settlement.
(b) In proposing the draft of letter quoted in paragraph (a) of this finding, the Office of the Chief of Ordnance gave the following explanation:
* * * The action set forth in the attached proposed letter was therefore developed as an appropriate procedure for the handling of this case, and as one which is legal and equitable to all concerned. It is a termination of the contractual relationship of Contract DA-33-019OED-506. It holds the parties, i.e., Department of Army, Department of Justice and the contractor, to their respective rights with the contractor, Department of Army, General Accounting Office and Department of Justice participating in the final resolution.
33. An Assistant Judge Advocate General of the Army, acting by direction of the Assistant Secretary of the Army (Materiel), informed the Chief of Ordnance on December 28, 1953, that the fifth paragraph of the proposed letter to Affiliated quoted in paragraph (a) of finding 32 should be deleted in its entirety, and that the third paragraph of the proposed letter should be revised to read as follows:
By reason of such contract and statutory violations, you are advised that the contract is cancelled.
34. Under the date of December 29,1953, Army Ordnance sent to Affiliated a letter canceling contract 506 in the following language:
*713 As a result of contractor actions, under which, rejected shells were processed in violation of Government inspection and acceptance provisions of Contract No. DA-33-019-ORD-506, as implemented by standard inspection procedures governing such shell deliveries, certain Army reports have been processed through Department of the Army channels to the Department of Justice. Considerations of Government actions on contract and statutory violations are now pending in the Department of the Army and the Department of Justice.
You were notified by the District on 30 October 1953 that the Government would not accept any additional shells produced by you until further notice; and rein-spection was then initiated of certain lots of shells previously processed. Reinspection in this regard is still under way.
By reason of such contract and statutory violations, you are advised that the contract is canceled.
Inasmuch as the rights of the Government in connection with the foregoing contract and statutory violations are under study by _ the Department of the Army and Department of Justice, you are advised that any further payments under this contract will be handled in accordance with the procedure for handling claims of a doubtful nature arising under contracts.
35. Affiliated requested clarification regarding the cancellation of contract 506, and a conference was accordingly held in Washington, D.C., on January 5, 1954. The conference was attended by the Deputy Assistant Secretary of the Army (Materiel), the Assistant Judge Advocate General of the Army mentioned in finding 33, the General Counsel of the Office of the Chief of - Ordnance, and the President and other representatives of Affiliated. With respect to the letter of cancellation set out in finding 34, representatives of the Department of the Army informed representatives of Affiliated:
* * * that the Department of the Army action in its letter had been carefully studied so that no injustice would be done the company, that such letter left open for a final determination the default, repudiation, or termination for the convenience of the Government of the contract.
36. In January of 1954, the entire T-91 shell program was abandoned by Army Ordnance because the supply was in *714 excess of the requirements for this shell, and. also because the T-91 shell had been found to be unacceptable for use by the Army Field Forces. The contracts of the other T-91 contractors were terminated for the convenience of the Government at that time.
37. On January 26,1954, Affiliated filed a notice of appeal to the Armed Services Board of Contract Appeals, appealing the cancellation of contract 506 on December 29,1953. This appeal was never pursued by Affiliated.
38. (a) Upon the assumption that contract 506 had been terminated for the convenience of the Government, Affiliated submitted to Army Ordnance in January 1954 a claim for termination costs. In response, Army Ordnance informed Affiliated (in part) “that such claim cannot be considered as arising out of a termination of the contract for the convenience of the Government pending further action and determination by the Department of Justice and by higher echelons of the Department of the Army.”
(b) Thereafter, Army Ordnance and Affiliated entered into a “no prejudice” agreement to the effect that the rights of the parties arising out of, or in connection with, contract 506 would not be affected by any action that the Department of the Army might take with respect to the verification of the termination costs set out in Affiliated’s claim. On the basis of this agreement, Army Ordnance caused a verification audit to be performed by the Army Audit Agency.
(c) After the verification audit referred to in paragraph (b) of this finding was performed, Army Ordnance, in order to complete the administrative processing of the claim for termination costs, forwarded it to the General Accounting Office on August 8, 1957, for direct settlement by that office.
(d) On November 21, 1958, the Comptroller General of the United States denied the claim for termination costs.
39. After contract 506 was canceled, representatives of Affiliated — and, later, representatives of the plaintiff subsequent to the merger of Affiliated with the plaintiff — conferred with officials of the Department of Justice regarding the Government’s claims arising out of alleged violations of the False Claims Act (31 U.S.C. § 231) by reason of the scheme referred to in finding 16. As a result of these conferences, *715 the plaintiff offered to pay the Government, in full settlement of the latter’s claims, $127,283 broken down as follows: (a) $17,715 as payment for reinspection costs incurred by the Government in the reinspection of shells delivered by Affiliated; (b) $49,568 representing the price of defective shells which were delivered to the Government and which the Government had already paid for; and (c) $60,000 representing damages under the False Claims Act. The plaintiff’s offer of settlement was accepted by the Government, and the following release was executed on behalf of the Government:
WHEREAS, the United States of America has asserted that conduct of Affiliated Gas Equipment, Inc., a Delaware corporation hereinafter referred to as Affiliated, its officers, directors and/or employees, prior to October 30, 1953, in connection with performance of a contract between Affiliated and the United States of America for the manufacture of shells dated July 31, 1951, entitled “Contract DA-33-019-Ord 506”, gave rise to valid claims of the United States of America against Affiliated for damages for breach of contract and for damages and forfeitures under the False Claims Act (31 U.S.C. 231), which assertions have been and are denied by Affiliated; and
WHEREAS, Affiliated has been merged into Carrier Corporation, a Delaware corporation hereinafter referred to as Carrier, in such manner as to vest in Carrier all the properties and business of Affiliated and to subject Carrier to all the liabilities of Affiliated, including the aforesaid claims; and
WHEREAS, the United States of America and Affiliated and Carrier desire to compromise said claims without thereby affecting in any way any other rights, claims, obligations or defenses whatsoever which the United States of America, and Affiliated, or Carrier may have against one another relating to said contract and its performance, breach, cancellation or termination;
NOW THEREFORE, the United States of America, in consideration of the payment to it by Carrier of the sum of $127,283.00 (One Hundred Twenty-Seven Thousand Two Hundred Eighty-Three Dollars) the receipt whereof is hereby acknowledged, hereby releases and forever discharges Carrier and Affiliated and Affiliated’s officers, directiors and/or employees from all money claims of the United States of America to damages for breach of contract and for damages and forfeit- *716 Tires under the False Claims Act, based on or arising out of any acts of Affiliated, its officers, directors and/or employees prior to October 30, 1953 in connection with performance of the contract above referred to; provided, however, that it is understood and agreed by the United States of America and Affiliated and Carrier that, except to bar assertion by the United States of _ America at any time of the claims hereby released, this release and the compromised [sic] evidenced thereby shall be without prejudice to any rights, claims, obligations or defenses whatsoever which the United States of America and Affiliated or Carrier have one against the other, and specifically that this release shall be without prejudice to the right of the United States of America to assert, and to the right of Affiliated and Carrier to deny, in any administrative or judicial proceeding or action that the claimed delivery of non-conforming shells and the activities of such officers, directors and/or employees of Affiliated in connection therewith constituted a sufficient basis for cancellation of said contract for cause and that Affiliated and Carrier have no enforceable rights under the Contract Settlement Act of 1944, 41 U.S.C. 101-125.
At the same time, the plaintiff authorized the retention of $127,283 from sums payable to the plaintiff (as successor to Affiliated), but previously withheld by the Government, in connection with the performance of contract 506 up to October 30, 1953.
40. After the deduction of the $127,283 mentioned in finding 39 was made, all remaining unpaid invoices for shells delivered under contract 506 were paid in full.
41. Workmen and supervisors who were employed by Affiliated, and who were acting within the scope of their employment, violated the provisions of contract 506 by devising and carrying out the scheme that is referred to in finding 16. Such violations provided good cause for the cancellation of contract 506 by the Department of the Army on December 29, 1953. However, the evidence in the record warrants the inference that, if there had been a continuing need for T-91 shells as of December 29, 1953, the Department of the Army would have waived the contract violations by Affiliated and would have permitted Affiliated to resume the production of shells under contract 506, upon the basis of Affiliated’s making the Department of the Army financially *717 whole with respect to the direct and incidental costs occasioned by or flowing from the scheme referred to in finding 16. (As of December 29, 1953, Affiliated had, in effect, already met the other conditions outlined in the letter that is set out in finding 22.)
42. If the cancellation of contract 506 on December 29, 1953, is to be regarded as a termination for the convenience of the Government under Article 25 of the contract, the termination costs of the contractor amounted to $794,793.68.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on the basis indicated, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c) of the rules of this court.
In accordance with the opinion of the court, a memorandum report of the commissioner, and a stipulation of settlement, it was ordered on April 5, 1965, that judgment for the plaintiff be entered for $65,000.

 Plaintiff paid the defendant a settlement of $127,283, including $60,000 under the False Claims Act, as “damages for breach of contract and for damages and forfeitures under the False Claims Act.” The parties agreed, however, that the settlement should be without prejudice to plaintiff’s claims with respect to the cancellation of the contract for cause. See finding 39.

 Later, Ordnance seems to have considered it unnecessary to resume operations in view of the decrease in the need for the shells.

 Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947) ; United States v. Stewart, 311 U.S. 60, 70 (1940) ; Sutton v. United States, 266 U.S. 575 (1921) ; Whiteside v. United States, 93 U.S. 247, 256-57 (1876).

 The findings make it clear that there was to be an investigation by Ordnance and consultations with the Department of Justice before any final decision was made. There is no adequate ground for saying that the Assistant Secretary followed, or should have followed, all these various steps until the time came for his determination. It is normal for an official of his echelon ,to await the presentation of all the data and recommendations before undertaking his own consideration. In the light of all the circumstances, there is likewise no adequate ground for saying that the consideration of what should be done with Affiliated’s contract, after the fraud was discovered, was unduly delayed by Ordnance. Almost immediately after the Assistant Secretary’s decision of December 16, Ordnance withdrew its conditional offer of November 17 (see finding 31).

 As defendant requests, the findings should contain the substance of the testimony of the Assistant Judge Advocate General and the stipulation that the Assistant Secretary would give essentially the same testimony. This evidence was that the Assistant Secretary put aside all considerations relating to increased capacity or reduced requirements for the shells and directed that the contract be ended on the basis of the contractor’s contractual violations and fraudulent actions.

 Since I believe that Affiliated materially breached its contract -which was then properly terminated for default, I do not reach the independent question of whether plaintiff is also barred from recovery by 28 U.S.C. § 2514. But it is implicit in my position that Affiliated should have pursued its administrative remedy, before the Board of Contract Appeals, to have the default termination set aside. Its failure in this respect is a further bar to recovery. United States v. Blair, 321 U.S. 730 (1944) ; United States v. Joseph A. Holpuch Co., 328 U.S. 234 (1946).

 Subsequent references in tbe findings to tbe production of shells by Affiliated are intended as references to the production of projectile parts for T-91 shells. Other contractors were also involved in the manufacture of T-91 shells for Army Ordnance at the same time that Affiliated was participating in the program.

 Provisions similar to those quoted in paragraph (b) of finding 2 were also contained in contract 181.

 A pallet consisted of 9 boxes, each, box containing 12 shells.

 The contracting officer was also the commanding officer ot the Cleveland Ordnance District.